**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.  4:18-CR-348 AGF/PLC** |
| | ) | |
| **VERNON JOHNSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**Order and Report and Recommendation**

This matter is before the Court on Defendant's Amended Motion to Suppress Evidence and Motion to Compel the Government to Provide Defendant with Unredacted Discovery.[1] Defendant contends that "his Fourth Amendment rights were violated when law enforcement obtained a key to his home and entered without a warrant and without consent."  [ECF No. 52]. The Government argues that: (1) exigent circumstances provided a basis for a warrantless entry; (2) police officers received consent to search and seize evidence; (3) evidence seized was in "plain view"; and (4) officers had "probable cause to conduct a warrantless arrest of the defendant."[2]

---

[1] With respect to the Motion to Compel, the Government stated in its Supplemental Response in Opposition filed prior to the hearing that defense counsel reviewed a "substantially unredacted copy of the St. Louis Metropolitan Police Department Incident Report 18-008220," as well as an investigative report, two 911 calls, and "multiple jail call clips." [ECF No. 56].  Defense counsel has not disputed that he reviewed these materials or that the Government has complied with the Jencks Act.  Counsel did not argue in support of the Motion to Compel at the hearing. Accordingly, the Court denies the Motion to Compel.

[2] With respect to seizure of evidence in plain view and probable cause to arrest defendant, Defendant has not challenged either that the ammunition seized was in plain view or that there was probable cause to arrest Defendant.  Accordingly, the Court declines to further address these issues.

**Factual Background**

On February 21, 2018, Ashley Puryear was the lessee of apartment 506 in the Leather Trade Artist Lofts ("Artist Lofts") in the City of St. Louis. Ms. Puryear occupied the apartment with her infant son and Defendant.

The Artist Lofts employed Jadienne Davidson as its property manager. Ms. Davidson arrived at the Artist Lofts around 8:20 or 8:25 a.m. on February 21. When she arrived, Ms. Davidson observed police officers at the front of the Artist Lofts, standing adjacent to the leasing office. The officers informed Ms. Davidson that they were answering "calls of shots fired." The officers believed the shots were coming from apartment 506, Ms. Puryear's apartment.

Ms. Davidson attempted to contact Ms. Puryear on her cell phone. Unable to reach Ms. Puryear, Ms. Davidson phoned Ms. Puryear's emergency contact, her father. Ms. Puryear's father agreed to attempt to reach Ms. Puryear but reported he was unsuccessful.

Having failed to communicate with Ms. Puryear, Ms. Davidson escorted the police officers to Ms. Puryear's apartment. Ms. Davidson testified that pursuant to Ms. Puryear's lease agreement, she believed she had the authority to allow police officers entry to an apartment "where immediate danger to person or property is reasonably suspected." On February 21, Ms. Davidson believed that Ms. Puryear was in danger.

Arriving at apartment 506, police officers knocked on the door and received no response. They knocked a second time, stating "police." Hearing no response, the officers used the key provided by Ms. Davidson and entered the apartment. Ms. Davidson observed Ms. Puryear standing in the kitchen when the officers entered her apartment.

Sergeant Kelly Fisher of the St. Louis Metropolitan Police Department testified about her involvement with the February 21 incident at the Artist Lofts. Sergeant Fisher recalled that on

February 21st, there were two "radio assignments."  The first call "was classified by the evaluator as a call for police help [involving] a female screaming from a particular apartment."  Officers Alex Klein and John Moton responded to the first call but apparently went to the wrong apartment, 605 rather than 506.  The second call stated "shots fired inside a particular apartment."  Sergeant Fisher responded to the second call because "it seemed like the incident maybe was escalating now that there were shots fired inside of an apartment building."  In addition to Sergeant Fisher, five additional officers responded, including Officer Mary Edmond and Officers Moton and Klein.

Upon her arrival at the Artist Lofts, Sergeant Fisher learned that Officer Edmond and another officer had visited Ms. Puryear's boutique on Washington Avenue to attempt to locate Ms. Puryear.  Sergeant Fisher also learned that the first call involved a possible mix-up in apartment numbers.  Sergeant Fisher instructed officers to check whether Ms. Puryear's vehicle was parked on the street or in a garage and also to knock on neighbors' doors.

Sergeant Fisher next requested emergency contact information from the property manager.  After receiving the information, Sergeant Fisher called Ms. Puryear's father - - the emergency contact.  Sergeant Fisher related that when she spoke with Ms. Puryear's father, he informed her that he and his wife were concerned and that he had been unable to reach his daughter.

Sergeant Fisher stated the following with respect to the need to contact Ms. Puryear:

> To make sure she was unharmed; that she didn't need police assistance based upon the nature of the call with shots fired inside the apartment.  We wanted to make sure her and everyone else in the apartment were safe.

Sergeant Fisher and several other officers proceeded to apartment 506.  Sergeant Fisher obtained a key to the apartment from Ms. Davidson, the leasing manager.  Sergeant Fisher used

the key to open the door to apartment 506.  Officers Moton and Klein first entered the apartment.

Sergeant Fisher, standing behind the two entering officers, observed Ms. Puryear walk towards

the front door to exit the apartment.  Ms. Puryear's demeanor was "very serious, very quiet," and

she voluntarily exited the apartment.

After visually confirming that Ms. Puryear was able to walk on her own, Sergeant Fisher

shifted her focus to the apartment.  Sergeant Fisher observed Defendant completely unclothed

emerge from a bedroom and St. Louis Metropolitan Police Department officers Moton and Klein

directing Defendant to lay on the ground and put his hands behind his back.  The officers

handcuffed Defendant and conducted a "safety sweep" to "make sure there was no one else in

there."  Sergeant Fisher testified that Defendant's demeanor was "odd," that he seemed "kind of

off" and "raised [her] concern."

Sergeant Fisher described the apartment as in disarray.  Liquid, live cartridges and shell

casings were scattered on the floor.  Dishes were turned over.  Sergeant Fisher observed bullet

holes in the walls, window blinds and "metal frame of a window."  She further noted damage to

a door that appeared caused by the forcing open of the door.

As part of her testimony, Sergeant Fisher identified photographs of the apartment's

condition at the time of her entry on February 21.  In particular, she reviewed photographs

depicting the condition of the baby's room.  Of note, the door to the baby's room had a bullet

hole in it.  A wall of the baby's room also contained a bullet hole as well as the wall of the

infant's closet.

Sergeant Fisher described the condition of Ms. Puryear's bedroom.  The bedroom had

bullet holes in the wall and the window blinds.  In addition, Sergeant Fisher observed bullets in a

baggie on a dresser in the bedroom along with a live cartridge on the bed.

4

Sergeant Fisher testified that Officer Klein seized two firearms. The firearms were placed on a kitchen counter where Sergeant Fisher photographed them.

Sergeant Fisher was present when Defendant started to struggle with Officer Moton in the hallway outside the apartment. Defendant kicked Officer Moton several times as Defendant and Officer Moton entered the elevator to exit the apartment. Sergeant Fisher assisted Officer Moton in subduing Defendant. Officer Moton sustained an injury to his groin and was later transported to a hospital.

Officer Mary Edmond of the St. Louis Metropolitan Police Department also participated in the February 21 call to the Artist Lofts. Officer Edmond testified that the caller provided very specific information that someone the caller knew was inside apartment 506 and the occupant's boyfriend was "actively firing a gun, and there was a small child in the apartment."

When Officer Edmond arrived at the Artist Lofts, Sergeant Kelly asked her to investigate Ms. Puryear's boutique on Washington Avenue to ascertain whether Ms. Puryear was there. Determining that the boutique was closed and no one was present, Officer Edmond returned to the Artist Lofts. Officer Edmond testified that when she returned, the officers at the Artist Lofts were attempting to contact Ms. Puryear and were concerned that they were unable to contact her, given that the 911 caller stated that "Vernon was actively firing shots in the apartment." Officer Edmond further stated that "we didn't know if Ashley, him and the baby were dead or if, you know, Ashley was deceased." Based on the information from the caller, Officer Edmond believed that the officers would not have left the Artist Lofts without physically seeing Ms. Puryear and verifying her safety.[3]

---

[3] Officer Edmond testified that during her career she had responded to approximately 50 domestic violence calls and, in her experience, "domestic violence situations" were more volatile than others. She further testified that when a situation involves an intimate partner, officers take

Officer Edmond described the scene prior to entry in to apartment 506.  Outside the apartment, officers had guns drawn.  An officer knocked on the door and when no one answered, the key was used to open the door.  Officer Edmond observed "a small-figured female walking towards the door."  Officer Edmond described Ms. Puryear as "visibly shaken, like a deer in the headlights" and "very eager to get out of there."  Officer Edmond advised that Ms. Puryear stated, "He's in the bedroom."

Officer Edmond accompanied Ms. Puryear to the hallway outside apartment 506. Defendant was trying to yell at Ms. Puryear and Officer Edmond wanted to interview Ms. Puryear without Defendant's interference.  While speaking with Officer Edmond, Ms. Puryear was crying and visibly upset and shaken.  Ms. Puryear stated she did not want Defendant to overhear her.

Ms. Puryear informed Officer Edmond that "Vernon" was upset with her because she did not pick him up in the evening.  She stated that Defendant pushed her on the bed, straddled her and tried to strangle her.  He then reached into the night stand, pulled a gun out and "put it to [Ms. Puyear] and told her to chill out."  When Ms. Puryear would not calm down, Defendant extended the gun behind him and fired multiple shots into the wall.  Ms. Puryear was able to get into her child's bedroom, lock the door and contact her friend.  Shortly thereafter, Defendant broke through the bedroom door and smashed Ms. Puryear's phone with the gun.

Officer Edmond also testified that Officer Klein, the primary investigating officer, was present during Officer Edmond's interview of Ms. Puryear.  Officer Klein asked Ms. Puryear "where Vernon kept his firearms, and she instructed him to go into the bedroom and go into the night stand, and they were in there."  After acquiring the information from Ms. Puryear, Officer

---

"extra caution."   Officers are concerned about safety as it relates to both the suspect and the victim.

Klein entered the apartment and retrieved two firearms from the night stand. Officer Klein reported to Ms. Puryear that he had the guns. According to Officer Edmond, Ms. Puryear did not "object to [Officer Klein] getting the guns" and Ms. Puryear "seemed extremely thankful and relieved" that Defendant was going to jail.

Officer Edmond believed that Ms. Puryear consented to seizure of the guns. Officer Edmond also stated that no area in the apartment other than the night stand identified as containing the guns was searched.

On cross-examination of Officer Edmond, defense counsel established that Officer Klein's written report did not contain a statement that Ms. Puryear either identified the guns' location or that she instructed officers to retrieve the guns. Counsel also established that the guns were not seized in the initial protective sweep and that the primary purpose for police entry into apartment 506 was to assure the safety of the occupants.

The Government called Agent Jeffrey Thayer, a special agent with the Bureau of Alcohol, Tobacco and Firearms, to testify regarding jail calls that he reviewed between Defendant and Ms. Puryear. The Government played a clip of a jail call that occurred on May 16, 2018. In the jail call, Ms. Puryear and Defendant had the following conversation:

> Johnson: I'm going to set up this visit…
> Ashley: Okay.
> Johnson: I'm gonna set up this visit for hopefully this time tomorrow, okay and then when you get here I wanna know like what you said to them, what made them go looking where they were looking, you know. 'Cause that's, that makes a big deal. Other than that…
> Ashley: (inaudible)
> Johnson: What'd you say?
> Ashley: I told you that already.
> Johnson: You said you already told me that?
> Ashley: I thought I told you that, but I guess yeah…
> Johnson: I can't remember if you told me, because it depends on if you, if you told them that uh, in your statement, that I reached into the drawer then that's different then them going and looking in your drawer.

7

Ashley: Okay.
Johnson: Do you remember which one you said?
Ashley: (inaudible)
Johnson: What?
Ashley: Yeah, I remember what I said.
Johnson: Because if they just went looking then that's a problem for them. Is there a problem for them?

Ashley: I, I don't think so.
Johnson: You don't think that they have a problem then?
Ashley: No.
Johnson: Okay. Well, if that's the case she's told them where to look then that gives them permission to look there. Therefore, it's gonna make it difficult when it comes to that day. So, it's time to argue.
Ashley: Okay, uh, I wish I knew exactly how I said it but I don't.
Johnson: (inaudible)
Ashley: I said I don't remember exactly how I said it for sure, but okay, I understand.

Following Agent Thayer, Ms. Puryear testified on behalf of Defendant.  Ms. Puryear commenced her testimony by stating she was represented by her own counsel.  Ms. Puryear further advised that she was told she could call her lawyer if she wanted during the hearing.

Ms. Puryear testified that she is in a relationship with Defendant and apartment 506 is her apartment.  Ms. Puryear acknowledged that police officers came to her apartment on February 21.  She further stated that officers asked her the location of guns in her apartment and "she told them where it was."  She denied giving police permission to "go in and get it."  In response to the question "and have you ever given any permission to go in and search your home," Ms. Puryear answered "No.  They were already in the house."

On cross-examination, Ms. Puryear testified that she shared an apartment with Defendant and their infant son.  On February 21st, police officers used a key to enter her residence and asked her to leave the residence and stand in the hallway to answer some questions.  She denied that any police officers placed her in handcuffs or forced her to speak with them.

Counsel for the government asked Ms. Puryear a series of question, as follows:

"What happened to that door?  Vernon Johnson caused the damage to that door, didn't he?"

Vernon Johnson, not Ashley Puryear, beat and kicked on that door till it cracked, didn't he?

You – You sat in that bedroom with your minor child, coddling [sic] him, trying to protect him because Vernon Johnson had just shot into the bedroom that your child was in, didn't you?

And while you were sitting on that floor that Vernon Johnson kicked that door in, came in, grabbed your phone and smashed it?

It was Vernon Johnson that had the guns in that house on February 21st, 2018, wasn't it?

The ammunition that was all over the house, that belonged to Vernon Johnson, didn't it?

In response to each question above, Ms. Puryear stated she "would like to invoke my Fifth."

Following extended discussion regarding the propriety of Ms. Puryear's invocation of the Fifth

Amendment, Ms. Puryear answered the above-questions in the affirmative.

Ms. Puryear also testified about the seized guns as follows:

Q: Police asked you where the guns were, correct?
A: That is correct
Q: And that's when you were in the hallway.
A: Yes.
Q: And at the point that the officer came out and asked you where the guns were, you told him.
A: Can you repeat that?
Q: When he asked - - When the officer asked you where are the guns, you told him where the guns were.
A: Yes.
Q: And you were truthful about where the guns were.
A: Yes.

After further discussion about the propriety of Ms. Puryear's attempt to invoke the Fifth

Amendment to protect Defendant, as opposed to herself, Government counsel asked the

following questions and received the following answers:

Q: And the officers went in, and they got the guns.  To your knowledge, you know that they at some point retrieved the guns.
A: After the fact of letting me back into my apartment, yes.
Q: But at some point after asking you and before you went back into the apartment, you believe the police got the guns.
A: As they were walking out, that's when I saw that they had something.

In addition, the Government played a second audiotape of a jail call between Ms. Puryear and Defendant.  On the jail call, Defendant tells Ms. Puryear that she can "recant."  Moreover, The Government counsel established that Ms. Puryear refused to cooperate with the St. Louis Circuit Attorney's office regarding prosecution of Defendant for the February 21 incident at her apartment.

Throughout her testimony, Ms. Puryear was visibly nervous, upset and at times appeared tearful.  Ms. Puryear attempted repeatedly to evade questions that might implicate Defendant or establish that she assisted police officers on February 21, 2018.

### Conclusions of Law

#### A. Introduction

The Fourth Amendment states, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV. "[R]easonableness is always the touchstone of Fourth Amendment analysis[.]"  Birchfield v. North Dakota, 136 S. Ct. 2160, 2186 (2016) (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)).  "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'"  Stuart, 547 U.S. at 404 (emphasis and alteration in original) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)).

"It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable[.]'"  Id. at 403 (quoting Groh v.

Ramirez, 540 U.S. 551, 559 (2004)). Importantly, however, an officer's "search or seizure carried out in an individual's home without a warrant is [not] *per se* unreasonable [if] it falls within one of the well-defined exceptions." Lesher v. Reed, 12 F.3d 148, 151 (8th Cir. 1994) (citing Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).

Consent to search by a person having authority over the property searched is an exception to the warrant requirement. See, e.g., Fernandez v. California, 571 U.S. 292, 298 (2014). "Consent searches are part of the standard investigatory techniques of law enforcement agencies and are a constitutionally permissible and wholly legitimate aspect of effective police activity." Id. (internal quotation marks omitted) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 228, 231-32 (1973)). "A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant." Fernandez, 571 U.S. at 307.

When a resident of a searched premises gives voluntary consent to search, "[a] warrantless search of a residence does not violate the Fourth Amendment[.]" United States v. Cisneros-Gutierrez, 598 F.3d 997, 1003 (8th Cir. 2010) (citing Schneckloth, 412 U.S. 218, 222). "Whether consent was voluntarily given 'is a question of fact to be determined from the totality of the circumstances.'" Id. (quoting Schneckloth, 412 U.S. at 227).

The presence of exigent circumstances is another exception to the warrant requirement. See, e.g., Mincey v. Arizona, 437 U.S. 385 (1978). "[W]arrants are generally required to search a person's home . . . unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Id. at 393-94. As the Supreme Court has held, "absent exigent circumstances, a warrantless entry [into a home] to search for weapons or contraband is unconstitutional even

when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." Groh, 540 U.S. at 559 (internal quotation marks omitted) (quoting Payton v. New York, 445 U.S. 573, 587-88 (1980)).

## B. Exigent circumstances

The Government contends that reports of "shots fired" in apartment 506 and a lack of response from Ms. Puryear support the warrantless entry into apartment 506 on February 21. Defendant argues that the delay between arriving at the Artist Lofts and responding to apartment 506 (according to Defendant approximately 30 minutes) precludes a finding of exigent circumstances.[4]

The Government bears the burden of establishing that exigent circumstances existed. United States v. Parris, 17 F.3d 227, 229 (8th Cir. 1994). The "narrowly drawn" exigent circumstances exception to the warrant requirement "justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." United States v. Ball, 90 F.3d 260, 263 (8th Cir. 1996). The Eighth Circuit has "long held the view that legitimate concern for the safety of individuals may constitute exigent circumstances justifying warrantless entries and searches" in a home. United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004) (internal quotation marks omitted) (quoting United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989)). In evaluating an assertion of exigent circumstances, "an objective standard is used to evaluate the reasonableness of the officer's belief that exigent circumstances existed." United States v. Selberg, 630 F.2d 1292, 1296 (8th Cir. 1980). (Citing Root v. Gauper, 438 F.2d 361, 364 (8th Cir. 1971).

---

[4] Without citing any case law support, Defendant states the following: "Defendant is not suggesting law enforcement are always unable to enter a home when they receive a call for 'shorts fired.' The distinguishing characteristic of this case is that law enforcement waited too long to enter the unit if they intended to claim exigent circumstances." [ECF No. 75].

In support of its position that exigent circumstances existed, the Government relies primarily on United States v. Jones, 635 F.2d 1357 (8th Cir. 1980).  In Jones, officers responded to a report of shots fired.  After focusing on a particular apartment, officers attempted to communicate with the apartments' occupants.  The officers knocked on the apartment door but received no response.  After approximately an hour, the apartment's landlord arrived with a key and opened the door to the defendant's apartment.  In challenging the warrantless entry, the defendant contended "that the one hour delay between the time the police first arrived at the scene and the moment they gained entry negates any belief the police may have had that the situation constituted an emergency."  635 F.2d at 1361.  In rejecting the defendant's argument, the Eighth Circuit stated, in words equally applicable here:

> Any delay that occurred was primarily the result of careful police work, as the officers first sought to elicit a response from the suspect and then attempted to obtain a key in an effort to avoid a forcible entry.
>
> …
>
> When the police have a reasonable suspicion that someone is injured or that the public safety is in jeopardy, but refrain from taking immediate action in an effort to confirm or deny, and then act once they have received no indication that the danger has dissipated, the waiting period does not defeat the applicable exception to the warrant rule.

Id. at 1361-62.

In this case, the record establishes that the police officers here approached the circumstances in a manner designed to assess the seriousness of the situation in apartment 506.  The inability to reach Ms. Puryear, along with the credible report of "shots fired," justified entry into the apartment without a warrant.  The delay was entirely reasonable under the circumstances and does not defeat application of the exigent circumstances exception.  See e.g. United States v. Valencia, 499 F.3d 813, 816-17 (8th Cir. 2007) (30 minute delay); United States v. Boettger, 71

13

F.3d 1410 (8th Cir. 1995) (overnight delay).[5]

### C. **Consent**

Defendant contends that Ms. Puryear did not consent to either the initial entry into her home or the search and seizure of Defendant's guns.  Defendant cites no cases in support of his argument that consent is lacking here but rather focuses on Ms. Puryear's admittedly confused denials that she either explicitly or tacitly consented to officers both entering her apartment and searching for the Defendant's guns.  The Government counters that Ms. Puryear provided express consent to seize the guns because when police officers asked where the guns were located, she informed the police officers that the guns were in the master bedroom night stand.

Law enforcement may conduct a warrantless search of premises "without running afoul of the Fourth Amendment[,]" when a person having authority over the premises voluntarily consents to the search, through behavior or otherwise.  United States v. Williams, 346 F.3d 796, 798 (8th Cir. 2003).  "The precise question is not whether [the individual] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented."  United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001).  Moreover, "[c]onsent can be inferred from words, gestures, and other conduct."  Id.; see also United States v. Faler, 832 F.3d 849, 853 (8th Cir. 2016) (apartment resident implicitly consented to police officer entry into an apartment where resident "stepped aside" so officers could enter); United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992) (Defendant's wife gave "voluntary consent" where she

---

[5] Defendant's reliance on Lovins v. Korte, No. 2:16-cv-38-PLC, 2019 WL 183973 (E.D.Mo. Jan. 14, 2019), is of no assistance.  In Lovins, the focus of the 911 call was that the suspect was drinking and yelling.  Police officers were able to speak with the alleged victim prior to entering her home and the suspect was standing outside the home and was handcuffed and in a patrol car at the time officers entered the alleged victim's home.  In contrast to Lovins, here the officers responded to a call of "shots fired."  Officers were not able to speak to either the suspect or the alleged victim before they entered the home.

never refused the officers entry, but instead stepped aside and motioned for the officers to enter.")

Based on the record, the Court concludes that Ms. Puryear both consented to entry into her apartment and the seizure of the guns from the night stand.  First, Ms. Puryear did not object to the officers' entry into her apartment.  Rather, when the officers opened the door with the property manager-provided key, Ms. Puryear quietly exited the apartment.  According to Officer Edmond, Ms. Puryear appeared shaken, anxious to leave the apartment and, in addition, expressly informed the officers of Defendant's location.  While talking to Officer Edmond outside the apartment, Ms. Puryear did not object to the officers entering or ask for the officers to leave.  To the contrary, according to Officer Edmond's credible testimony, Ms. Puryear appeared relieved the officers were there.  Given the condition of the apartment, it is more likely that Ms. Puryear was relieved to have law enforcement in her apartment than the reverse.[6]

With respect to the seizure of the guns, there is no dispute that Ms. Puryear specifically informed officers of the guns' location.  There is also no dispute that her statements were voluntary.  The only question is whether Ms. Puryear's identification of the guns' location constitutes additional support for the Government's position that Ms. Puryear consented to the search for and seizure of the guns.

In United States v. Wesela, 223 F.3d 656 (7th Cir. 2000), the defendant's wife called 911 and stated that her husband had a gun, threatened to kill her and shot the family cat.  The wife permitted police officers to enter the apartment and, although officers did not ask for permission to search the apartment, the defendant's wife did not object to the search.  Defendant's wife also

---

[6] Based on Ms. Puryear's behavior during her courtroom testimony as well as the content of the jail calls between Defendant and Ms. Puryear, the Court concludes that Ms. Puryear continues to be in fear of Defendant and her testimony is not credible.

told officers the location of the gun.  In rejecting the defendant's argument that his wife did not consent to the search for the gun, the Seventh Circuit stated as follows:

> The fact that there was no direct verbal exchange between [the police officer] and [the defendant's wife] in which she explicitly said "it's o.k. with me for you to search the apartment," is immaterial, as the events indicate her implicit consent.
>
> ….
>
> Due to proximity of the rooms, [the defendant's wife] was probably aware of what was going on in the bedroom and elsewhere in the apartment.  Had she wished to do so, she could have objected to [the police officer's] search.

223 F.3d at 661.  As in United States v. Wesela, Ms. Puryear's failure to object to the search of her apartment as well as her voluntary identification of the location of the guns, constitutes consent to search the apartment and seize the guns.  See also United States v. Hylton, 349 F.3d 781, 786 (4th Cir. 2003) (wife consented to search and seizure of a gun, where, among other things, she told police officers "specifically that the gun was located in the bedroom where she and [defendant] slept – 'under the bed,' 'under the mattress.'")  Based on the totality of the circumstances, the Court recommends denial of Defendant's Motion to Suppress on the grounds that law enforcement lacked consent to search apartment 506 and seize Defendant's guns.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Compel [ECF No. 52] is **DENIED**.

**IT IS HEREBY RECOMMENDED** that Defendant's Amended Motion to Suppress Evidence [ECF No. 52] be **DENIED**.  The parties are advised that they have **fourteen (14) days** in which to file written objections to the Report and Recommendation pursuant to 28 U.S.C. Section 636(b)(1).  Failure to file timely objections may result in waiver of the right to appeal questions of fact.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of June, 2019